Thomas D'Amore, OSB No. 922735
Email: tom@damorelaw.com
Nicholas A. Kahl, OSB No. 101145
Email: nick@damorelaw.com
**D'AMORE LAW GROUP, P.C.**
4230 Galewood Street, Suite 200
Lake Oswego, OR 97035
Telephone: (503) 222-6333
Facsimile: (503) 224-1895

James F. McDonough, III, *pro hac vice forthcoming*,
Email: jmcdonough@hgdlawfirm.com
**HENINGER GARRISON DAVIS, LLC**
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Telephone: 404-996-0869
Facsimile: 205-326-3332

Attorneys for Plaintiff.

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **BRANDON PECK**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**DRAFTKINGS, INC.**, a Delaware corporation, and **FANDUEL, INC.**, a Delaware corporation,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION ALLEGATION COMPLAINT FOR:<br><br>1. ORS 30.740 – Right of Gambling Loser to Recover Double Losses<br>2. Negligence<br>3. Fraud and Misrepresentation<br>4. Unlawful Trade Practices Act (ORS 646.605, *et seq.*)<br>5. Civil Conspiracy<br>6. Unjust Enrichment<br><br>CLASS ACTION ALLEGATION<br><br>JURY TRIAL DEMAND |

## I.    INTRODUCTION

Plaintiffs Brandon Peck ("Plaintiff Player"), individually, and on behalf of all others similarly situated, by and through counsel, bring this action against DraftKings, Inc. ("DraftKings") and FanDuel, Inc. ("FanDuel," and collectively with DraftKings, "Defendants") in this Original Complaint.

## II.    NATURE OF THE ACTION

1.    This is a class action complaint against Defendants, two companies operating Daily Fantasy Sports ("DFS") websites in a manner that violates Oregon law.

2.    Plaintiff brings this action on his own behalf and on the behalf of an Oregon class of persons (defined in the definition of Player Classes below) who, like Plaintiff, sustained ascertainable losses arising out of Defendants' systematic and continued violation of the Oregon Revised Statutes, civil laws, and various criminal laws (the "Player Classes Members").  Under the authority of ORS 30.740, all persons losing money or anything of value from unlawful gambling or lottery shall have a cause of action to recover from the dealer or proprietor, twice the amount of money or double the value of the thing lost within three (3) years. When the term "Player Classes" is used herein, it shall refer to the Player Classes defined below (in Section VIII). When the term "Player Classes Members" is used, it shall refer to all putative members of the Player Classes.

3.    DraftKings is operating an illegal online sports betting (gambling) business within the State of Oregon.

4.    FanDuel is operating an illegal online sports betting (gambling) business within the State of Oregon.

5.    Article XV, Section 4, of the Oregon Constitution states:

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

**(1)** Except as provided in subsections (2), (3), (4), (8) and (9) of this section, **lotteries and the sale of lottery tickets, for any purpose whatever are prohibited, and the Legislative Assembly shall prevent the same by penal laws.**

**(2)** The Legislative Assembly may provide for the establishment, operation, and regulation of raffles and the lottery commonly known as bingo or lotto by charitable, fraternal, or religious organizations. As used in this section, charitable, fraternal or religious organization means such organizations or foundations as defined by law because of their charitable, fraternal, or religious purposes. The regulations shall define eligible organizations or foundations, and may prescribe the frequency of raffles, bingo or lotto, set a maximum monetary limit for prizes and require a statement of the odds on winning a prize. The Legislative Assembly shall vest the regulatory authority in any appropriate state agency.

**(3)** There is hereby created the State Lottery Commission which shall establish and operate a State Lottery. All proceeds from the State Lottery, including interest, but excluding costs of administration and payment of prizes, shall be used for any of the following purposes: creating jobs, furthering economic development, financing public education in Oregon or restoring and protecting Oregon's parks, beaches, watersheds and native fish and wildlife.

. . .

**(9)** Only one State Lottery operation shall be permitted in the State.

**(10)** The Legislative Assembly has no power to authorize, and shall prohibit, casinos from operation in the State of Oregon.

(Emphasis added.)

6.      Throughout this operative Complaint, a reference to "betting" or "bet(s)" shall also have the meaning of "gambling" or "gamble(s)," respectively, and such words shall be used interchangeably herein.

7.      Defendants define their sports betting scheme as DFS in a specious attempt to circumvent Oregon law which expressly prohibits "gambling" and "betting." Defendants' sports betting contests are based upon the performance of teams and individuals that participate in NCAA college football, NCAA college basketball, NFL, NBA, MLB and NHL, and also upon

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

the partial or final result of games.

8.     In traditional fantasy sports leagues contestants draft their teams before the season, maintaining the same core roster for months.

9.     In contrast to season-long fantasy sports, Defendants accept wagers from bettors for various sporting events using a scheme they created that assigns values (points) based upon the performance of athletes and teams engaged in amateur and professional athletic competitions.

10.    After the sporting events are concluded, Defendants calculate a score using the scheme they created that awards points based upon the various individual college and professional athletes' performance and pays bettors that have the highest total number of points.

11.    Players select an entry fee, which is up to $5,000, and the number of the games or teams they wish to play. If their roster generates more points than their rivals on that day or week, they win all the money in the pot, minus Defendants' average cut of, upon information and belief, 6.5%.

12.    Upon information and belief, Defendants use "bots" or fake accounts to act as "shills" in the gambling scheme in order to stimulate and increase the dollar amount of play of actual bettors and to increase the "house" take from that play, and also to create the illusion among actual bettors of interacting with other actual bettors on equal footing, which is untrue and is a ruse.

13.    Recently, lawmakers have scrutinized Defendants' business model and operations, alleging substantial similarities between Defendants websites, DraftKings.com and FanDuel.com, and online poker and other gambling websites.  For instance, the General Counsel for the Georgia State Lottery, Joseph Kim, wrote Defendants and noted that Georgia's constitution bans gambling except for state lottery activities.  *See* **Exhibit A**; *see also,*

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

http://bigstory.ap.org/article/d2f22b64c83748468dfc6e4d84f8b001/georgia-joins-states-scrutinizing-fantasy-sports-companies.   Also, the Attorney General of Georgia is currently investigating the legality of DFS sites like those of Defendants.   *See* http://www.11alive.com/story/sports/2015/11/13/states-cracking-down-fanduel-draftkings-ga-still-weighing-options/75734526/.

14.     In referring to Defendants, former Congressman Jim Leach stated that his anti-gambling act, the UIGEA, was supposed to stop gambling on the internet – not promote it. Former Rep. Jim Leach said lawmakers had no idea daily fantasy sports would "morph into today's cauldron of daily betting."[1]   In fact, former Congressman Leach told the Associated Press: "There is no credible way fantasy sports betting can be described as not gambling." *Id.* "Only a sophist can make such a claim." *Id.*   The federal regulation is codified at 31 U.S.C. 5361 *et seq.*   The Act expressly provides that it shall not be construed as altering, limiting, or extending any state law that prohibits, permits, or regulates gambling within the United States. 31 U.S.C. 5361 § 5361(b).

15.     The Federal Bureau of Investigation and the Department of Justice are also probing whether the business model of DFS operators like Defendants violates this and other federal laws.[2]

16.     Additionally, on October 15, 2015, the Nevada Gaming Control Board ("NGCB") ordered Defendants to cease their operations in the State of Nevada, because their operations constitute gambling and they need a gambling license to continue operations in that state.[3]

---

[1] http://bigstory.ap.org/article/7b3af0d8b0c04f059e8b301adf8b1784/former-congressman-says-dfs-cauldron-daily-betting
[2] https://www.washingtonpost.com/news/sports/wp/2015/10/20/draftkings-fanduel-fbi-investigation-could-freeze-daily-fantasy-players-money-for-years/
[3] See NOAG October 15, 2015 Notice, attached hereto as **Exhibit  B**.

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

17.     A day after the NGCB issued its Notice, the State of Nevada Office of the Attorney General ("NOAG") offered its legal analysis, concluding that "[i]n short, daily fantasy sports constitute sports pools and gambling games. They may also constitute lotteries, depending on the test applied by the Nevada Supreme Court.  As a result, pay-to-play daily fantasy sports cannot be offered in Nevada without licensure."[4]

18.     On November 10, 2015, Eric T. Schneiderman of the State of New York Office of the Attorney General sent Defendants a Notice to Cease and Desist and Notice of Proposed Litigation.[5]  According to Attorney General Schneiderman, the Office's "review conclude[d] that [Defendants'] operations constitute illegal gambling under New York law . . . ."  Moreover, it stated that

> New York Attorney General has been deeply concerned to learn from health and gambling experts that DFS appears to be creating the same public health and economic problems associated with gambling, particularly for populations prone to gambling addiction and individuals who are unprepared to sustain losses, lured by the promise of easy money. Certain structural aspects of DFS make it especially dangerous, including the quick rate of play, the large jackpots, and the false perception that it is eminently winnable. Ultimately, it is these types of harms that our Constitution and gambling laws were intended to prevent in New York.

*Id.* at 2.

19.     According to  DrafKings.com, DraftKings, Inc. appears to operate under the misrepresentation that DFS is a game of skill - not chance, and thus legal: "The legality of daily fantasy sports is the same as that of season long fantasy sports.  Federal Law and 45 of the 50 US

---

[4] See NOAG October 16, 2015 Legal Analysis, attached hereto as **Exhibit  C**.
[5] See NOTICE TO CEASE AND DESIST AND NOTICE OF PROPOSED LITIGATION PURSUANT TO NEW YORK EXECUTIVE LAW § 63(12) AND GENERAL BUSINESS LAW § 349, dated November 10, 2015, attached hereto as **Exhibit  D-1**; NOTICE TO CEASE AND DESIST AND NOTICE OF PROPOSED LITIGATION PURSUANT TO NEW YORK EXECUTIVE LAW § 63(12) AND GENERAL BUSINESS LAW § 349, dated November 10, 2015, attached hereto as **Exhibit  D-2**.

D'AMORE LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

states allow skill based gaming. Daily fantasy sports are a skill game and are not considered gambling." See DraftKings.com.  However, DraftKings, Inc. also knows that its DFS is not a game of skill but instead is one of chance.

20.    According to FanDuel.com, FanDuel also claims, in error, that its gambling operations were made legal by the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA").

> ▼ Is this site legal in the US and Canada?
>
> Yes, fantasy sports is considered a game of skill and received a specific exemption from the 2006 Unlawful Internet Gambling Enforcement Act. FanDuel uses exactly same rules as any other season long fantasy sports game, the only difference is that our games last only a day. Thanks to fantasy sports being specifically excluded from laws affecting online betting, FanDuel is safe for players in the US and Canada.

*See* https://www.fanduel.com/p/AddFundsFtd? However, FanDuel knows that its DFS is not a game of skill but instead is one of chance.

21.    Defendants' customers are betting on the outcome of athletic feats achieved by sports teams and players over which they have no control, therefore Defendants' activities constitute the unlawful operation of gambling activities and illegal lotteries within the State of Oregon.  Regardless of the alleged amount of "skill" that Defendants attribute to the illegal gambling that it promotes, Oregon law expressly defines "gambling" to mean "a person stakes or risk something of value upon the outcome of **a contest of chance or a future contingent event not under the control or influence of the person**, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." *See*, ORS 167.117(7) (emphasis added). Further, Oregon law expressly defines a "contest of chance" to mean "any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." ORS 167.117(6).

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

22.     Further, by charging fees for a chance to win the gaming contests promoted by it (and at times risking its own assets to cover such contests), Defendants have operated an illegal lottery in Oregon. Under Oregon law, a "lottery" means "an unlawful gambling scheme in which: (a) the players pay or agree to pay something of value for chances… and (b) the winning chances are to be determined by a drawing or by some other method; and (c) the holders of the winning chances are to receive something of value." *See* ORS 167.117(12). Regardless of the alleged degree of skill that it attributes to the gaming contest created and promoted by Defendants, Defendants have engaged in the operation of an illegal lottery in Oregon (which, as noted above, is expressly prohibited by Oregon law and Article XV, Section 4, of the Oregon Constitution) because chance is clearly an element affecting the outcome in these contests.

23.     Defendants take bets on sporting events or partial sporting events and the performance of players, either full or partial performance, in such events, and such acceptance of bets or gambling consideration are gaming and/or gambling transactions.

24.     Defendants' DFS is an illegal gambling operation masquerading as a "game of skill."   In other words, Defendants' websites, DraftKings.com and FanDuel.com, are each an illegal gambling device.  Plaintiff Player and Player Classes Members paid and did pay wagers to Defendants through its illegal DFS and lost over the three (3) years prior to the filing of the original complaint and Defendants' operation of the illegal DFS proximately caused Plaintiff Player's and Player Classes Members' injuries.

25.     The loser of the bets (money or goods lost) are Plaintiff Player and Player Classes Members.

26.     The winner of the bets (money or goods lost) are Defendants.   Defendants received the money or goods to Plaintiff Player's use.   Additionally, the winner of the bets

D'AMORE LAW GROUP     4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

(money or goods lost) are Defendants when the "bots" or fake accounts ("shills") are employed, to the extent Defendants risks their own money in the "overlay," and as one who shares in the profits. Alternatively, the winner of the bets (money or goods lost) are Defendants as the stakeholder that took the gambling consideration from the Plaintiff Player and Player Classes Members. Alternatively, the winner of the bets (money or goods lost) are Defendants (as the agent) that took the bets (money or goods lost) from the Plaintiff Player and Player Classes Members (principal(s)) for the illegal gambling and/or gaming transactions. Alternatively, Defendants are the transferee of the winnings of the bets. Alternatively, Defendants each are the winner as the broker that is paid a commission.

     27.    Plaintiff Player and Player Classes Members are entitled, as a matter of law, to recover the twice money they lost.

### III.   PARTIES

     28.    Plaintiff Player, Brandon Peck, is a resident of Polk County, Oregon, and is a citizen of Oregon. He brings this action on behalf of himself individually, and on behalf of Player Classes Members (a class of persons similarly situated as described in the class definition below) who, within three (3) years preceding the filing of this Class Action Complaint to the present, delivered money or goods through a transaction in Oregon to Defendants in order to gamble or place wagers on the on-line sports betting site known as DraftKings.com and FanDuel.com, while in Oregon, and who sustained a monetary loss. Plaintiff Player did within three (3) years preceding the filing of this Class Action Complaint, deliver money or goods through a transaction in Oregon to both Defendant DraftKings and Defendant FanDuel in order to gamble or place wagers on the on-line sports betting site known as DraftKings.com and FanDuel.com, respectively, while in Oregon, and sustained a monetary loss as a result of playing

D'AMORE LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

on DraftKings.com and FanDuel.com

29.     DraftKings is a Delaware corporation with its principal place of business in Boston, Massachusetts.

30.     DraftKings conducts business and collects bets throughout the State of Oregon, having thousands of Oregon residents accessing and gambling on its website DraftKings.com.

31.     FanDuel is a Delaware corporation with its principal place of business in New York, New York.

32.     FanDuel conducts business and collects bets throughout the State of Oregon, having thousands of Oregon residents accessing and gambling on its website FanDuel.com.

33.     This Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers upon the Court original jurisdiction over all civil actions arising under the laws of the United States. This Honorable Court has jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332 (d), because the proposed class consists of 100 or more members; the amount in controversy exceeds five million ($5,000,000.00) exclusive costs and interest and minimal diversity exists.  This Honorable Court has jurisdiction pursuant to diversity jurisdiction, 28 U.S.C. § 1332 (a), because the plaintiff and defendant are citizens of different states and the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.   This Honorable Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  This Honorable Court has personal jurisdiction over Defendants because they conduct business in Oregon and solicits citizens of Oregon on its website, and has sufficient minimum contacts with Oregon. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because

D'AMORE LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

Defendants have caused harm to and injured Player Classes Members residing in this District.

## IV.   FACTUAL BACKGROUND

34.     Defendants are each operating an illegal online sports betting business through DraftKings.com and FanDuel.com, respectively, within the State of Oregon.

35.     Defendants accept wagers from bettors for various sporting events using a scheme they created that assigns values (points) based upon the performance of athletes engaged in amateur and professional athletic competitions.

36.     After the sporting events are concluded, Defendants calculate a score using the system they created that awards points based upon the various individual college and professional athletes performance. Defendants then pays the bettors who have the highest total number of points.

37.     Plaintiff Player, Mr. Peck, is an individual who has utilized each of Defendants websites and deposited money with DraftKings and FanDuel on DraftKings.com and FanDuel.com, respectively.   He has lost bets on each of the websites and incurred monetary losses as a result of said use. Thus, Defendants are indebted to the Plaintiff Player for the money so lost and paid, or received to Plaintiff Player's use, or converted the goods won of the Plaintiff Player to Defendants' use for the time period between the filing of the original complaint up and until three (3) years ago.

38.     Plaintiff Player and Player Classes Members allege that gaming on Defendants' DFS platform requires very little or no skill and that the outcome therefore is determined largely by chance.   In fact, many of Defendants'   customers lack even a rudimentary understanding of sports, or betting strategy in general, and yet participate in Defendants' website operations, and lose and win based on pure luck.

D'AMORE LAW GROUP   4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

39.    Within three (3) years of the filing of the original complaint, Plaintiff Player delivered money to each of Defendants which was lost upon a game or wager within the three (3) years of said delivery.

40.    Defendants' sports betting schemes are a game of chance that involves little skill. The outcome depends in a material degree upon an element of chance.

41.    Defendants' sports wagering schemes involves selecting a set number of athletes that will play in a single sporting event.

42.    Defendants establish a point system that correlates with the athletes' performance during a single athletic event.

43.    Defendants determine which athletes its bettors can select and assigns a handicap (spread) based upon the athletes' perceived potential to score points.

44.    Defendants eliminate almost the entire element of skill by establishing a handicap (similar to a point spread) for a limited number of athletes it determines can be used for a particular waging event and by limiting the allotted "salaries" to be used on selecting athletes for a particular wagering event.  As a result, any winnings are made as a result of "sleeper" athletes randomly performing above average.  By establishing a "spread" for each athlete and limiting the number of athletes the bettors can use, bettors are engaging in a gambling scheme predominately based upon chance. Indeed, Jason Robins, the Chief Executive Officer of DraftKings, stated on Reddit.com (an on-line fantasy sports betting blog) that the concept is "almost identical to a casino."

45.    By establishing a "spread" for each athlete and limiting the number of athletes the bettors can use, along with the "salaries" to be used in selecting athletes, bettors are engaging in a gambling scheme in which the outcome depends in a material degree upon an element of

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

chance.

46.     Defendants have each created an on-line betting website by devising a game that awards points based upon the performance of various professional and college athletes and teams in specific games on specific days. Defendants charge an entry fee and then accept wagers from bettors for these sporting event contests, from which they deducts a commission or "rake" in an amount of, upon information and belief, approximately 6.5%. The charging of entries fees and a commission on the dollars wagered by its bettors is the primary basis of Defendants' revenues; thus, the revenues to Defendants largely depend upon the price of the entry fee for each contest as well as the total dollars wagered by the bettors in each contest.

47.     Defendants also frequently guarantee a certain amount will be paid in prize pool winnings for a given sporting contest and, when necessary, cover the difference for the bettors between the guaranteed prize amount and the sum total of entry fees and/or total amounts wagered. The difference between the entry fees and amounts wagered and the guaranteed prize money is known as the "overlay." In situations where an overlay is needed from Defendants, Defendants risk their own assets in the gambling ventures they promote and, thus, has a significant incentive to attract as many bettors as possible in order avoid paying out their own money to cover the overlay.  Once bettors on each of Defendants websites have wagered their sums by selecting a given athlete or team, the bettor has no ability to control the outcome of the betting contest. Specifically, Defendants' bettors have no ability to control how many points their selected athlete or teams will receive from the actual athlete's or team's performance. Instead, only the actual athlete players and teams in the underlying sporting events control their own performances, and even then, these actual athlete and teams are subject to a number of chance variables, such as "bad" officiating, illegal contact, sickness, injury, weather conditions,

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

and any number of other variables well beyond the actual athlete or sporting team's own control. As a result, after Defendants bettors place their bet by setting their final lineups, they have no ability to influence the outcome of the actual sporting event game. At that point, the bettors wait to see what happens based upon the performance of the actual players and teams selected.

48.    Oregon penal law and civil law (and the UIGEA) prohibit Defendants' sports gambling schemes because they are each a game of chance.

49.    According to a survey conducted by the Sports Business Journal, only 1.3% of players realized gains from their participating in online fantasy sports.[6] Indeed, this is akin to the odds one would find at a casino sports gambling operation.

50.    DFS platforms, including the sports betting scheme implemented by Defendants, return casino-type "odds" and involve little skill.

51.    A player may win with a randomly generated roster, just as one may win with a carefully curated roster.

52.    Defendants' gambling scheme is a game of chance because an individual athlete's performance (especially in one game) will always be affected by material elements of chance that affect scoring and winning outcomes including variables such as player injury, fumbles, weather conditions, controversial officiating, suspension, or other off field circumstances.

53.    The bettors or gamblers have no measure of control over all the variables that affect the performance of the college and professional athletes, rendering Defendants' scheme a game of chance.

54.    Regardless of whether the gaming scheme developed by Defendants are characterized as predominately one of "skill" or "chance," such characterization is meaningless

---

[6] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx.

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

in Oregon, as it is well established under Oregon law that Defendants are engaged in the promotion and operation of a gambling enterprise because their activities easily encompasses a person staking or risking "something of value upon the outcome of a contest of chance or a future contingent even not under the control or influence of the person" as defined ORS 167.117(7). Under ORS 167.117(6), a "contest of chance" is expressly defined as "any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance." Thus, unlike other states' laws that define gambling to be only those activities in which chance· predominates, no such analysis is applicable under Oregon law— where a material degree of chance is involved, gambling is established in Oregon.

55.    Although they have not yet ruled that Defendants' DFS platform are each a website for "gambling," the Oregon Attorney General has ruled that Electronic Gaming Devices or Keno are lotteries under Article XV, Section 4, of the Oregon Constitution. See, Op. Or. Att'y. Gen. No. 2010-6 (Whether Electronic Gaming Devices or Keno machines Constitute Lotteries, Oct. 21, 2010) (ruling that Keno clearly is a lottery and Measure 75's electronic gaming devices are lotteries to the extent they operate purely or predominantly on chance).

56.    Playing on Defendants' DFS platforms is also gambling in that players are staking or risking money upon the outcome of a contest of chance or a future contingent event not under the control or influence of the person, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome.

57.    Based upon the facts alleged herein, Defendants also promote, operate and manage an illegal lottery in violation of Oregon's Constitution and Oregon statutory law. Pursuant to ORS 167.117(12), a "lottery" means "a unlawful gambling scheme in which: (a) the players pay or agree to pay something of value for chances…(b) the winning chances are to be

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

determined by a drawing or by some other method; and (c) the holders of the winning chances are to receive something of value." The three elements of a lottery are: consideration, prize and chance. *State v. Coats*, 158 Or. 122, 128, 74 P.2d 1102, 1105 (1938). As alleged above all three elements are present with respect to Defendants' DFS gaming platform. First, Plaintiff Player and all bettors, including Player Classes Members, pay money to Defendants for the ability to participate in the gaming contests. Second, Plaintiff Player and all bettors, including Player Classes Members, are offered a monetary prize which, if won, would greatly exceed the amount wagered and paid to Defendants. Lastly, there clearly is an element of chance with respect to Defendants' ' DFS gaming website. Once again, Oregon Attorney Generals and Oregon law holds that it is the particular character of the game—and not the skill or lack of skill of an individual participant that determines whether the game at issue is one of chance or skill. See, Op. Or. Att'y. Gen. No. 2010-6 (Whether Electronic Gaming Devices or Keno machines Constitute Lotteries, Oct. 21, 2010) (ruling that Keno clearly is a lottery and Measure 75's electronic gaming devices are lotteries to the extent they operate wholly or predominantly on chance).

58.    As alleged above, Defendants' bettors can acquire and exercise the all the knowledge in the world as to which actual athlete and team may a better performer over other athletes and teams but this alleged skill (while it theoretically could increase the odds of winning—though studies show that it does not) ultimately does not determine the outcome—instead, it is only the actual  athlete and sporting team that have any semblance of control of the actual outcome, and even these actual sporting participants are subject to chance. Defendants' gambling schemes clearly involve a significant degree of chance because an individual athlete's performance will always be affected by material elements of chance that affect scoring and

D'AMORE LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

winning outcomes including variables such as player injury, player error, weather conditions, controversial officiating, suspension, or other off field circumstances and other conditions well beyond the control of the actual athlete or team. Defendants' bettors have no measure of control over all of the variables that affect the performance of the college and professional athletes that they select, and, thus, Defendants have, in addition to engaging in gambling, promoted and conducted an illegal lottery in Oregon.

59.    Defendants represent that their gambling scheme is not illegal.

60.    Defendants' representation that the UIGEA legalized bookmaking and gambling under the guise of "fantasy sports" is false and misleading.

61.    The UIGEA did not legalize fantasy sports, it merely provided an exemption to banks from being held liable for processing transactions relating to certain fantasy sports.

62.    The UIGEA was enacted to regulate banks and other payment processors, not bookmakers.

63.    Under the UIGEA's definition, unlawful internet gambling means "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet" that is illegal under federal, state, or tribal law.

64.    Oregon law prohibits sports gambling schemes, including Defendants', and prohibits Defendants from accepting payments from or entering into gambling transactions with persons in Oregon, including Plaintiff Player and Player Classes Members.

## V.    INSIDER TRADING FACTUAL BACKGROUND

### A.  <u>Daily Fantasy Sports</u>

65.     Defendants claim that they are able to operate their websites because they market DFS as a game of skill. They also claim their gaming websites to be similar to pari-mutuel horse

D'AMORE LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

race wagering in that players compete against each other for prize pools and whereby Defendants takes their fee from the prize pool itself.

66.    Defendants held themselves out to Plaintiff Player and Player Classes Members as places where their skill made a difference between winning and losing. For instance, in a television commercial (available at https://www.youtube.com/watch?v=VDa-cDu8KYg) that ran in August 2015, DraftKings advertised "every week, use your knowledge and showcase your skills…you like football, you like winning." In another commercial in August 2015 (available at https://www.youtube.com/watch?v=bfCm6PJuL5I), DraftKings advertised its website as "a game within the game, that requires a different set of skills . . .  we don't just play, we are players, we train, and we win."

67.    Similarly, FanDuel advertised (available at http://www.ispot.tv/ad/AVPC/fanduelcom-one-week-fantasy-football-get-paid-for-knowledge) that players could "get paid for [their] knowledge" if they were  "smarter than the average fan."

**B.  <u>Value of Inside Information and Data</u>**

68.    DFS customers play against each other by choosing a line-up of players at certain positions until they have reached a "salary cap" for their team, and then entering tournaments with entry fees as low as 25 cents and as high as $5,300.  The players whose fantasy teams score the most points - based on the real statistics of those players in that game – win the most money.

69.    Defendants allege that DFS is not gambling because of the alleged skill involved in picking a winning team. According to DraftKings CEO, Jason Robins, DraftKings attracts players "who are analytical and favor data and research."  Mr. Robins said: "They do their homework. It's like the stock market. They enjoy looking at something and trying to figure out

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

something that someone else doesn't see."[7]

70.     Setting aside the fact that DraftKings claim that DFS is not gambling is untrue, the biggest edges any player can have comes from having data and information on what other bettors are doing (i.e., bettor behavior). DraftKings and FanDuel employees have access to these things, neither of which is public. For instance, DraftKings performs analytics to determine statistics regarding bettors that win particular games, which players and teams are favored by bettors, return on investment of certain strategies, and even how lineups on FanDuel would do if they were entered into DraftKings contests, and vice versa.  Defendants knows the value of this bettor behavior data and knows that it should not be shared: "The reason that I don't want to give the actual numbers is because I believe it creates a slippery slope where people start requesting stats on win rates of various strategies, which I believe is not a positive thing . . . .  That said, I really don't think site owners should be sharing stats on winning vs. non-winning strategies. Part of what makes this a skill game is that people who are skilled at it can figure out for themselves how to win consistently.   And on that note, I do also want to point out that skilled stacking is absolutely a winning a strategy on DK. There are plenty of people who stack and win very consistently."[8] Mr. Robins went on to claim: "A lot of mixed teams that are winning on other sites would fade the stacks on DK and win if they were just entered. But they are not being entered. Take a look at some other site winning lineups and add it up for DK, you'll see it happening."[9]

---

[7] Howard Stutz, *DraftKings CEO Compares Fantasy Sports to Chess, Stock Investing,* Las Vegas Review-Journal, (Sept. 29, 2015), available at http://www.reviewjoumal.com/business/casinos-gaming/draftkings-ceo-compares-fantasy-sports-chess-stock-investing (last visited Oct. 7, 2015).
[8] https://rotogrinders.com/threads/dk-stacking-tonight-8230-129959?page=5 (accessed Oct. 7, 2015).
[9] https://rotogrinders.com/tbreads/dk-stacking-tonight-8230-129959?page=7 (accessed Oct. 7, 2015).

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

71.     In addition to years of data on bettor behavior, which gives Defendants' employees a huge advantage over even the most "skilled" DFS players, Defendants' employees also have real-time access to data on current lineups of every player in every contest, and the overall ownership percentages of every player.

72.     Defendants also set player pricing through certain proprietary models, and this data provides them with details about the value of certain players that other contestants do not have.

73.     Because the alleged goal is to beat the other players, a player with statistical data about ownership percentages of competitors would have an edge over players without this data in many ways, including the ability to make rosters with enough players different from competitors' rosters.

74.     Indeed, a DraftKings employee, Ethan Haskill, accidentally posted ownership percentages online before they were supposed to be publicly available - that is, before all of the contestants' lineups were "locked" and could therefore still be changed. This employee initially claimed he was "the only person with this data and as a [DraftKings] employee, am not allowed to play on site."[10]

75.     However, the same week that Mr. Haskill posted roster data before he was supposed to, this same employee played on FanDuel and beat 229,883 entrants, coming in 2nd and personally winning $350,000.[11] An analysis of this employee's previous DFS history shows a remarkable increase in winnings since moving from a job with rotogrinders.com covering DFS to inside DraftKings working for a DFS company.

---

[10] https://rotogrinders.com/tbreads/draftkings-ownership-leak-850584?page=1#reply-850635 (accessed Oct. 7, 2015).

[11] http://llarrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741 (accessed Oct. 7, 2015).

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

76.   DraftKings and FanDuel, in concert, said that Mr. Haskill beating 229,883 people the same week it was clear he had access to ownership data was a "coincidence."

77.   In all, DraftKings employees have won at least $6,000,000 playing at FanDuel in, which is more than one million dollars per year considering DraftKings is only a few years old.[12] The ability of FanDuel to calculate that information within days of public knowledge shows that FanDuel can track which players are from other DFS sites and can track how much they are winning, losing or otherwise what the possibility is that other DFS employees are using non-public information, data and insider bettor behavior information.

78.   DraftKings was well aware of its employees playing at FanDuel (and vice versa), and was aware that some of its employees made more money from winnings on FanDuel than their actual salaries.[13]

79.   For instance, FanDuel profiled one of its own employees who played on other sites and had won $50,000 in a short period of time, but has since removed the article from its website.[14]

80.   Mr. Robins admitted that he "had reservations" about allowing employees to play on other sites and allowing other sites' employees to play on his site, and even spoke to his competitors about ending the practice, but ultimately decided, in concert with his competitors, to continue the practice.  Mr. Robins said: "And I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have

---

[12] http://www.businessinsider.com/draftkings-daily-fantasy-sports-fandue1-2015-10 (accessed Oct. 7, 2015).

[13] https://www.bostong1obe.com/business/2015/10/05/draftkings-bans-employees-from-competitorssites/s36ig5e0eVOOR9C55R8hwL/story.html (Oct. 7, 2015).

[14] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (accessed Oct.·7, 2015)

D'AMORE LAW GROUP   4230 Galewood St., Ste. 200   Lake Oswego, OR 97035   (503) 222-6333

policies such as this one in place"[15]

81.    In that same article, Mr. Robins admitted that numerous employees have access to data that could give players an advantage, including customer service and engineering workers.

82.    Mr. Robins had previously discussed[16] any sort of issue that affected "game integrity" as fraud, and literally the first person to respond to Mr. Robin's remarks was Mr. Haskill, the employee who won $350,000:

---

[15] http://www.betaboston.com/news/2015/10/07/draftkings-ceo-had-reservations-about-employees-playing-fantasysports-but-didnt-expect-uproar/ (accessed Oct. 7, 20 15).
[16] https://rotogrinders.com/threads/ok-industry-wide-concern-this-is-not-directed-at-any-single-85017?page=1 (accessed Oct. 7, 2015).

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

JRobs                                                                    2 years ago



DraftKings CEO

This is a very interesting topic. One of the things DraftKings has been talking about from day 1 is fraud prevention, and while I cannot speak for other sites, I would imagine that many of the basic steps we have taken have been adopted by most. There is a whole category of payment fraud and identity fraud that we focus on, but I will focus here on the game integrity question since that is the one that was raised.

First off, we built our customer support tools interface so that the same rules that apply to players on the site also apply to what our customer service representatives can do. In this case, that means that when games start and rosters lock, changes are no longer possible for either party. We have had people contact us claiming their screen "locked early" before they could make a swap and asking us to do it for them. Unfortunately, even if we wanted to, our customer support team literally can't do this.

However, it is possible that someone on our tech team could manually go into the database and change something by writing code. Aside from simply being VERY selective about who we give database access, we recognize that there is a need to protect against fraud here. Not only could a rogue employee be disruptive, but someone could attempt to hack the database, as well. I cannot go into detail about what exactly we do here, but we have put a lot of safeguards in place to prevent this. Additionally, we have very strong monitoring tools and reports that flag suspicious activity or things that simply should never be happening on the site, such as a lineup change made later than a contest start time. There are many other things we look for, as well, and we have actually caught a few players that were attempting fraud. A good sign to me is that every one of them has been caught immediately following their first fraud attempt and each one has been banned from the site by pretty much any identifiable characteristic – name, username, address, and even IP address.

Of course, fraud is an issue that (as Cal mentioned with poker) is naturally going to be a lightning rod for the DFS industry as it grows. I would love to see the sites start to band together on these things to help put current players at ease and make new players more comfortable giving DFS a try. I know within certain industries, fraud techniques are widely shared amongst competition, and I think it serves all of us well to minimize fraud on anyone's sites, not just our own. One no-brainer to me is some sort of public exchange between sites and affiliates of "known fraudster" lists. There is no reason why someone banned from one site should easily be able to go play on another. This is something we have talked about a lot internally, so I'd be interested to hear if other site reps out there think there might be broader interest within the industry in getting something like this going?

                                                                    Reply Quote Link

Ethan                                                                    2 years ago



DraftKings Rep

Awesome detailed response, Jason.

                                                                    Reply Quote Link

83.       In that post, Mr. Robins uses the word "fraud" or "fraudster" nine times. Mr.



D'AMORE LAW GROUP        4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

Robins also discussed how sophisticated its data analysis and fraud prevention efforts were, including tracking users by their Internet Protocol, or IP, addresses. Thus, DraftKings could easily monitor users who worked for FanDuel or other sites to determine their winnings and whether there existed the possibility they were using inside information.

84.    For instance, an analysis by DFS Report shows that an employee at FanDuel, Matthew Boccio, who works in product operations, is one of the top 50 players in all of DFS, despite only playing on one site.[17] While there is no direct evidence Mr. Boccio had access to ownership data, this individual won more than $50,000 in the early part of the baseball season on other sites. One of his jobs includes setting player prices, which gives him detailed daily information about pricing models and could help him identify inefficiencies or opportunities on other sites. While the article has been removed from FanDuel's website, a version is still on the internet. In that article, the FanDuel employee profiling Mr. Boccio noted: "The fact Boccio does not play on FanDuel against you folks is a good thing. He clearly has a winning strategy . . . or 10."[18]

85.    According to Legal Sports Report, an "industry insider who wished to remain anonymous told LSR that 'a significant number of the whales at the top DFS sites are employees - often executives- of other sites.' (From a DFS operator's point of view, a "whale" is simply a high-volume player that generates significant revenue, not necessarily a winning or losing player.)"[19] FanDuel's CEO admitted to personally playing on competitor sites.[20]

86.    Had Plaintiff Player and/or Class Members of the proposed classes known that

---

[17] https://dfsreport.com/6898/follow-up-to-draftkings-fanduel-mishapsl (accessed Oct. 7, 2015)
[18] http://www.engadget.com/2015/10/05/draftkings-fanduel-face-questions-about-insider-trading/ (Oct. 7, 2015).
[19] http://www.legalsportsreport.com/4548/draftkings-data-leak-faq/ (Oct. 7, 2015).
[20] https://rotogrinders.com/threads/my-name-is-nigel-eccles-ceo-of-fanduel-ask-me-anything-381899?page=3 (Oct. 7, 2015).

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

FanDuel and DraftKings were working in concert to allow employees of DFS sites to play against them, Plaintiff Player and/or Player Classes Members of the proposed classes would not have played on Defendants' websites.

87.    Had Plaintiff Player and/or Player Classes Members of the proposed classes known that FanDuel and DraftKings had acted in concert to sanction this practice, Plaintiff Player and Player Classes Members would not have played on Defendants' websites.

88.    After disclosure of the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites, DraftKings and FanDuel issued numerous joint and/or identical statements on their websites, continuing to act in concert.

89.    DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

90.    Ultimately, FanDuel and DraftKings together changed their internal rules to both prevent their employees from playing on other DFS sites and to prevent DFS employees from playing on their sites.

## VI.    INVALIDITY OF DRAFTKINGS' ARBITRATION PROVISION, CLASS WAIVER, AND TERMS OF USE

91.    At the outset, upon information and belief, when Plaintiff Player joined DraftKings.com, DraftKings had no arbitration provision or class waiver provision in its Terms of Use.

92.    Regardless, DraftKings' current Terms of Use is not a valid, enforceable contract.

93.    Plaintiff Player and DraftKings Player Class Members were fraudulently induced into placing money onto DraftKings' platform because it was supposed to be a fair game of skill,

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

but instead is no more than a game of chance, thus illegal gambling under Oregon law.

94.    The so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by DraftKings are illusory. Indeed, there is no restriction on DraftKings' ability to terminate the "agreement" or to refuse to perform. For example, the so-called "Terms of Use" provide that DraftKings and related individuals such as officers and directors are released from any liability for any claim by the user "whatsoever": "By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to … [examples of various types of liability listed]." *See* https://www.draftkings.com/help/terms

95.    Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder." Thus, once again, DraftKings are not bound to any performance obligation.  *See* https://www.draftkings.com/help/terms

96.    The Terms of Use purport to require arbitration, but gives DraftKings the exclusive right to revoke the arbitration provision because it states that "Any claim or dispute between you and [DraftKings] that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in…" Suffolk County, Massachusetts. *See* https://www.draftkings.com/help/terms

97.    In addition, a user only has to check a box saying he or she has read the Terms of Use to sign up for the website, and the deposit of money and entry into contests is done through

D'AMORE LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

separate transactions that do not reference or refer to any Terms of Use. Moreover, when signing into DraftKings.com at any particular time, no "Terms of Use" are referenced or otherwise shown.



98.    Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to DraftKings the right to deny service to any user for any reason "whatsoever": "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever." Thus, DraftKings is not bound to any performance obligation. *See* https://www.draftkings.com/help/terms

99.    Further, the entirety of the contracts between DraftKings and Plaintiff Player and DraftKings Player Class Members are void as a matter of law (as noted herein), including any arbitration or class waiver provisions in the "Terms of Use."

100.    The Terms of Use are procedurally and substantively unconscionable.

**<u>Plaintiff Player and Player Classes Members Had No Agreement to Arbitrate or Waive Class Claims With DraftKings</u>**

101.    As a result of all of the information provided in the foregoing numbered paragraphs, Plaintiff Player and DraftKings Player Class Members did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class for any gambling contract

formed with DraftKings.

102.    Further, the entirety of the contracts between DraftKings and Plaintiff Player and DraftKings Player Class Members are void as a matter of law (as noted herein), including any alleged arbitration or class waiver agreements or provisions in the "Terms of Use."

103.    Alternatively, any alleged arbitration or class waiver provision or agreement included in any Terms of Use is based on illegal and/or invalid consideration, making any alleged arbitration provision or agreement between Defendant and Plaintiff Player and DraftKings Player Class Members invalid as a matter of law.

104.    Moreover, any alleged arbitration or class waiver agreement or provision is procedurally and substantively unconscionable.

## VII.    INVALIDITY OF FANDUEL'S ARBITRATION PROVISION, CLASS WAIVER, AND TERMS OF USE

105.    At the outset, upon information and belief, when Plaintiff Player joined FanDuel.com, FanDuel had no arbitration provision or class waiver provision in its Terms of Use.

106.    Regardless, FanDuel's Terms of Use is not a valid, enforceable contract.

107.    Plaintiff Player and FanDuel Player Class Members were fraudulently induced into placing money onto FanDuel's platform because it was supposed to be a fair game of skill, but instead is no more than a game of chance, thus illegal gambling under Oregon law.

108.    The site contains a hidden "Terms of Use" page.  Plaintiff Player and FanDuel Player Class Members are not required to sign, initial, check any boxes, or otherwise confirm that they agreed to the arbitration and class waiver sections of the "Terms of Use," and in fact did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class. Upon review, it appears that a link called "Terms of Service" appears as a greyed out link in

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

small text on the bottom of the sign up page and is specifically designed in a way to make sure terms are unnoticeable.  The relevant, miniscule text says "Joining confirms you're 18+ years of age and that you agree to our Terms of Service.  There does not appear to be any "Terms of Service" on the FanDuel.com website, though the link leads to a document called "Terms of Use."



109.    In fact, the place where you make payment for the gambling monies on FanDuel.com does not even have the small greyed out text or any link or reference whatever to the "Terms of Service," never mind "Terms of Use."   See https://www.fanduel.com/p/AddFundsFtd? Moreover, when signing into FanDuel.com at any particular time, no "Terms of Use" are referenced or otherwise shown.

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200 Lake Oswego, OR 97035 (503) 222-6333



110.    Plaintiff Player and FanDuel Player Class Members are not required to sign, initial, check any boxes, or otherwise confirm that they agreed to the arbitration and class waiver sections of the "Terms of Use" and did not assent to or agree to arbitrate any claims or waive their right to bring any claims as a class.

111.    As a result of all of the foregoing numbered paragraphs, Plaintiff Player and FanDuel Player Class Members did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class for any gambling contract formed with FanDuel.

112.    Regardless, the so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by FanDuel are illusory.  Indeed, there is no restriction on FanDuel's ability to terminate the "agreement" or to refuse to perform.  For example, the so-called "Terms of Use" provide that FanDuel and related individuals such as officers and directors are released from any liability for any claim by the user whatsoever:   "You agree to release and to indemnify, defend and hold harmless FanDuel and its parents, subsidiaries, affiliates and agencies, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities, from and against any and all losses, liabilities, expenses, damages, costs

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

(including attorneys' fees and court costs) claims or actions of any kind whatsoever arising or resulting from your use of the Service, your violation of these Terms of Use, your receipt, ownership, use or misuse of any prize, and any of your acts or omissions that implicate publicity rights, defamation or invasion of privacy." See https://www.fanduel.com/terms

113.    Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to FanDuel the right to deny service to any user for any reason whatsoever: "You acknowledge and agree that FanDuel may remove any User Content and terminate any FanDuel account at any time for any reason (including, but not limited to, upon receipt of claims or allegations from third parties or authorities relating to such User Content)." Thus, FanDuel is not bound to any performance obligation. See https://www.fanduel.com/terms

114.    Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give FanDuel the right "to cancel contests, in our sole discretion, without any restrictions." Thus, once again, FanDuel is not bound to any performance obligation. See https://www.fanduel.com/terms

115.    Further, the entirety of the contracts between FanDuel and Plaintiff Player and FanDuel Player Class Members are void as a matter of law (as noted herein), including any arbitration or class waiver provisions in the "Terms of Use."

116.    The Terms of Use are procedurally and substantively unconscionable.

### Plaintiff Player and Player Classes Members Had No Agreement to Arbitrate or Waive Class Claims With FanDuel

117.    As a result of all of the information provided in the foregoing numbered paragraphs, Plaintiff Player and FanDuel Player Class Members did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class for any gambling contract formed with FanDuel.

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

118.    Further, the entirety of the contracts between FanDuel and Plaintiff Player and FanDuel Player Class Members are void as a matter of law (as noted herein), including any alleged arbitration or class waiver agreements or provisions in the "Terms of Use."

119.    Alternatively, any alleged arbitration or class waiver provision or agreement included in any Terms of Use is based on illegal and/or invalid consideration, making any alleged arbitration provision or agreement between FanDuel and Plaintiff Player and FanDuel Player Class Members invalid as a matter of law.

120.    Moreover, any alleged arbitration or class waiver agreement or provision is procedurally and substantively unconscionable.

## VIII.  CLASS ALLEGATIONS

121.    A class action is the proper form to bring Plaintiffs claims under Federal R. Civ. Proc. 23. The potential class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

122.    This action satisfies all of the requirements of Federal R. Civ. Proc. 23, including numerosity, commonality, typicality, adequacy, predominance and superiority.

123.    **Numerosity:** the Player Classes is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. News accounts discuss how millions of users compete on the websites of Defendants.

124.    **Commonality**: the claims made by Plaintiff Player and Player Classes Members meet the commonality requirement because they present shared questions of law and fact, and

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

resolving these questions will resolve the class wide litigation. These shared questions predominate over individual questions, and they include, without limitation:

a)      Whether the promotion and operation of Defendants DFS gaming platforms constitute "gambling" as defined by ORS 167.117(7);

b)      Whether the promotion and operation of Defendants DFS gaming platforms each constitute an illegal "lottery" as defined by ORS 167.117(12);

c)      Whether the transactions entered into between Defendants and Plaintiff  Player and Player Classes Members are gambling transactions supported by gambling consideration;

d)      Whether such transactions are per se void, pursuant to Oregon law;

e)      Whether Defendants promoted, advanced and profited from illegal gambling in violation of Oregon law;

f)      Whether Defendants intentionally or recklessly engaged wrongful conduct such as to warrant punitive damages;

g)      Whether Plaintiff Player  and Player Classes Members have been damaged and to what extent;

h)      Whether Defendants' Terms of Use are unconscionable, illusory, fraudulent or otherwise invalid;

i)      Whether Plaintiff Player and Player Classes Member entered into an agreement with Defendants to arbitrate and waive class claims;

j)      Whether Defendants' employees used non-public data and/or information to gain an advantage at DFS sites; whether FanDuel and DraftKings acted in concert to condone, allow or promote this practice; and whether FanDuel and DraftKings were negligent in allowing employees to access and use confidential data, or were negligent or committed fraud in failing to

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

disclose to Plaintiff Player and the Player Classes Members that these practices were occurring.

125.    **Typicality:** Plaintiff Player's claims are typical of those of the other Player Classes members because Plaintiff Player, like every other Player Classes Member, was induced to use Defendants DFS gaming platforms based on false and misleading advertisements that DFS was a game of skill when, in fact, it is a game of chance, thus constituting illegal gambling under Oregon law.

126.    The claims of the class representative Plaintiff Player are furthermore typical of other Player Classes Members because they make the same claims as other Player Classes Members; and Plaintiff Player's claims and those of the Player Classes Members are based upon the same legal theories, and arise out of the same practices and course of conduct engaged in by Defendants.  Plaintiff Player  has an interest in seeking compensation from Defendants on behalf of all Player Classes Members.

127.    Further, the representative Plaintiff Player's damages arise out of nearly identical and repetitive policies and practices engaged in by Defendants.

128.    **Adequacy:**  Plaintiff Player will fairly and adequately represent and protect the interests of the Player Classes Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Player Classes Members. Plaintiff Player seeks no relief that is antagonistic or adverse to the Player Classes Members and the infringement of the rights and the damages they have suffered are typical of other Player Classes Members.

129.    **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Player Classes Members to prosecute their common claims in a single forum

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Player Classes Members, who could not individually afford to litigate a complex claim against a large corporate defendant like Defendants. Further, even for those Player Classes Members who could afford to litigate such a claim, it would still be economically impractical.

130.    The nature of this action and the nature of Oregon laws available to Plaintiff Player and the Player Classes Members makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff  Player and the Player Classes Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Player Classes Members with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff Player were exposed is representative of that experienced by the Player Classes Members and will establish the right of each Player Classes Members to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

131.    The proposed "Classes" are described as follows:

**"All persons in the State of Oregon who participated in DraftKings' DFS, deposited money in a DraftKings account, and lost money in any game or contest during the period between the filing the original complaint and three (3) years prior to the filing of the original complaint" (the "DraftKings Player Class")**

132.    **"All persons in the State of Oregon who participated in FanDuel's DFS,**

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

deposited money in a FanDuel account, and lost money in any game or contest during the period between the filing the original complaint and three (3) years prior to the filing of the original complaint" (the "FanDuel Player Class," and collectively with the DraftKings Player Class, the "Player Classes")Plaintiff Player reserve the right to modify or amend the definition of the proposed Player Classes and to modify, amend, add or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

133.    Excluded from the Player Classes are:

a.    DraftKings and any entities in which DraftKings has a controlling interest;

b.    Any entities in which DraftKings' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of DraftKings;

c.    The Judge to whom this case is assigned and any members of the Judge's immediate family and any other judicial officer assigned to this case;

d.    All persons or entities that properly execute and timely file a request for exclusion from the Class;

e.    Any attorneys representing the Plaintiffs or the Class.

## COUNT I—VIOLATION OF ORS 167.117; RIGHT OF GAMBLING LOSER TO RECOVER DOUBLE LOSSES ORS 30.740

134.    Plaintiff Player repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

135.    Plaintiff Player represents himself and all Player Classes Members in this Count and asserts this Count on behalf of the same.

136.    As noted herein, Plaintiff Player and Player Classes Member's wagering on

D'AMORE LAW GROUP   4230 Galewood St., Ste. 200   Lake Oswego, OR 97035   (503) 222-6333

Defendants' DFS website was gambling, DraftKings.com and FanDuel.com are gambling devices, and Defendants operate an illegal lottery in Oregon.

137.    ORS 30.740 provides:

> All persons losing money or anything of value at or on any unlawful game described in ORS 167.117, 167.122 and 167.127 shall have a cause of action to recover from the dealer winning the same, or proprietor for whose benefit such game was played or dealt, or such money or thing of value won, twice the amount of the money or double the value of the thing so lost.

138.    Plaintiff Player and the Player Classes Members paid money or delivered money or other things of value (namely the charging of credit against their credit cards or money) to Defendants during the time period between the filing of the original complaint and three (3) years preceding the filing of the Original Complaint, which was lost upon a game or wager within the three (3) years. The payment or delivery of said money or credit resulted in a loss to Plaintiff Player and Player Classes Members for which Defendants are obligated to return under ORS 30.740 because, as alleged above, Defendants' activities in Oregon constitute "gambling" as defined under ORS 167.117(7), an illegal "lottery" under ORS 167.117(12), and Defendants' DFS gaming platforms are each a "gambling device" under ORS 167.117(8), all of which mean Defendants' DFS gaming platforms are unlawful games and are against public policy.

139.    Such gambling transactions took place in Oregon, Defendants collected the bets, and Defendants' operation of each of the illegal DFS gaming platforms proximately caused injury and damage to Plaintiff Player and Player Classes Members in the form of the losses to Plaintiff Player and Player Classes Members during the time period between the filing of the original complaint and three (3) years preceding the filing of the original complaint.

140.    ORS 167.127 provides that unlawful gambling in the first degree is a Class C felony. ORS 167.127 provides that "a person commits the crime of unlawful gambling in the first degree if the person knowingly promotes or profits from unlawful gambling." ORS 167.117(17)

D'AMORE
LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

"profits from unlawful gambling" is defined as "a person, acting other than solely as a player, accepts or receives money or other property pursuant to an agreement or understanding with another person whereby the person participates or is to participate in the proceeds of unlawful gambling." ORS 167.117(18) provides that a person "promotes unlawful gambling" when, "a person, acting other than solely as a player, engages in conduct that materially aids any form of unlawful gambling." As alleged above, Defendants have induced Plaintiff Player and the Player Classes Members to gamble and it derived an economic benefit due to Plaintiff Player and Player Classes Members losses.

141.    Defendants acted intentionally and/or recklessly with respect to its wrongful conduct because they were aware, but consciously disregarded, the substantial and unjustifiable harm that they would cause to Plaintiff Player and Player Classes Members for engaging in gambling, providing a gambling device, and offering illegal lotteries. As a result, Defendants' actions and omissions constituted a reckless and/or gross deviation from the standard of care that an ordinary person would exercise under the circumstances.

142.    Based upon the above allegations and factors, Plaintiff Player and Player Classes Members would respectfully request entry of twice the amount of the money or double the value of damages suffered as permitted under ORS 30.740.

## COUNT II – NEGLIGENCE

143.    Plaintiff Player repeats, realleges, and incorporates by reference each of the foregoing allegations as though full set forth herein.

144.    Plaintiff Player represents himself and all Player Classes Members in this Count and asserts this Count on behalf of the same.

145.    Defendants owed duties to Plaintiff Player and Player Classes Members as users

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

and paying customers of its site to use reasonable care to provide true, reliable and safe information and contests.

146.    Defendants breached their duties to Plaintiff Player and Player Classes Members by failing to prevent persons with inside information and data by virtue of their employment at other DFS sites from competing against Plaintiff Player and Player Classes Members.

147.    In the course of their business, profession and employment, Defendants and their agents, representatives and employees supplied false information to Plaintiff Player and Player Classes Members.

148.    Plaintiff Player and Player Classes Members and the proposed classes justifiably relied upon the information supplied by Defendants, and, as a result, engaged in business with Defendants and lost money.

149.    Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data and ability of employees to use material, non-public data to compete against Plaintiff Player and Player Classes Members on other websites, or allow employees of other companies with material, non-public access to compete on the website where Plaintiff Player and Player Classes Members competed.

150.    As a direct and proximate result of Defendants' negligence, Plaintiff Player and Player Classes Members were damaged in an amount to be proven at trial.

## COUNT III – FRAUD AND MISREPRESENTATION

151.    Plaintiff Player repeats, realleges, and incorporates by reference each of the foregoing allegations as though full set forth herein.

152.    Plaintiff Player represents himself and all Player Classes Members in this Count and asserts this Count on behalf of the same.

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

153.    Defendants made material representations that were false, that Defendants knew were false or were reckless as to the veracity and made with the inducement for Plaintiff Player and Player Classes Members to act upon.

154.    Specifically, and as detailed above, Defendants represented that their contests were fair games of skill. Defendants also willfully failed to disclose that employees, agents, owners and/or others with non-public information, data and access to Plaintiff Player's and Player Classes Members' submissions would use this information to compete against Plaintiff Player and Player Classes Members and obtain an enormous increased chance to win, thereby greatly decreasing Plaintiff Player's and Player Classes Members' ability to win.

155.    Plaintiff Player and Player Classes Members acted in reliance on the false, material representations and omissions made by Defendants, which caused them injury.

156.    Plaintiff Player and Player Classes Members would not have deposited money or engaged in any activity on Defendants' websites if they had known that they were competing against individuals with insider knowledge, access and use of non-public data.

157.    Defendants were aware that the integrity of the games was a material fact in inducing Plaintiff Player and Player Classes Members to give them money in exchange for services and agreeing to the alleged contract.

158.    As a result of Defendants' fraudulent representations and fraudulent omissions, Plaintiff Player and Player Classes Members were induced into a contract that they otherwise would not have made and suffered financial injury, harm and damages as described in this Complaint.

**COUNT IV – VIOLATION OF OREGON UNLAWFUL TRADE PRACTICES ACT**

159.    Plaintiff Player repeats, realleges, and incorporates by reference each of the

D'AMORE LAW GROUP

4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

foregoing allegations as though full set forth herein.

160.    Plaintiff Player represents himself and all Player Classes Members in this Count and asserts this Count on behalf of the same.

161.    The Oregon Unlawful Trade Practices ORS 646.605, *et seq.*, was enacted to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services.

162.    ORS 646.605, *et seq.* prohibits unfair, false, misleading or deceptive acts and/or practices in the conduct of any trade or commerce, including any unconscionable activities.

163.    Defendants are in the business of marketing, selling and promoting goods and services in Oregon through television advertising, radio and internet advertising directly marketed, targeted and with the intent to reach Oregon consumers, including Plaintiff Player and Player Classes Members.

164.    Plaintiff Player and Player Classes Members are in privity with Defendants.

165.    DraftKings' actions as described above, including the omission of the fact that competing players and company employees had insider information, are false, misleading, deceptive and/or unconscionable, in violation of the Oregon Unlawful Trade Practices Act.

166.    Plaintiff Player and Player Classes Members have been damaged as a direct and proximate result of Defendants' violations of the Oregon Unlawful Trade Practices Act. Plaintiff Player and Player Classes Members are entitled to recover actual damages including but not limited to loss of value of their vehicles, and other equitable relief pursuant to the Oregon Unlawful Trade Practices Act.

## COUNT V – CIVIL CONSPIRACY

167.    Plaintiff Player repeats, realleges, and incorporates by reference each of the

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

foregoing allegations as though full set forth herein.

168.    Plaintiff Player represents himself and all Player Classes Members in this Count and asserts this Count on behalf of the same.

169.    As detailed above, DraftKings and FanDuel engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

170.    Specifically, by affirmatively agreeing to allow competitors' employees to play on their own sites against their own players and concealing and not disclosing this to Plaintiff Player and Player Classes Members, DraftKings and FanDuel committed negligence and/or fraud.

171.    This overt act was done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit, continue to attract new players to their websites, and otherwise profit because of their unlawful activities.

172.    DraftKings knew that its employees played on FanDuel, and FanDuel knew that its employees played on DraftKings.

173.    DraftKings and FanDuel gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete against and beat players on other DFS sites.

174.    As a direct and proximate result of FanDuel and DraftKings' concerted actions, Defendants are also liable to Plaintiff Player and Player Classes Members.

### COUNT VI – UNJUST ENRICHMENT

175.    Plaintiff Player repeats, realleges, and incorporates by reference each of the foregoing allegations as though full set forth herein.

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

176.    Plaintiff Player represents himself and all Player Classes Members in this Count and asserts this Count on behalf of the same.

177.    Plaintiff Player and Player Classes Members conferred a benefit on Defendants by depositing money and playing in contests on their websites.

178.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff Player and Player Classes Members deposits and contest entries, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the facts concerning the fair play available on their websites.

179.    Plaintiff Player and Player Classes Members were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for entry into contests and deposited money onto Defendants' websites, which they would not have done had they known the true facts. Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff Player and Player Classes Members is unjust and inequitable, Defendants must pay restitution to Plaintiff Player and Player Classes Members for their unjust enrichment, as ordered by the Court.

**DEMAND FOR JURY TRIAL**

Plaintiff Player hereby demands a jury trial of their claims to the extent authorized by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Player and Player Classes Members pray for relief and judgment against Defendants, as follows:

a.    For an order certifying the Player Classes, appointing Plaintiffs and their counsel to represent the Player Classes and notice to the Player Classes to be paid by Defendants;

b.    For a declaration, that Defendants' activities alleged herein violate

D'AMORE LAW GROUP    4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

Oregon's Constitution and Oregon statutory law which prohibits gambling, gambling devices, and lotteries;

c.      For a declaration, that any transactions entered into by Plaintiff Player and Player Classes Members with Defendants are void as against public policy and Oregon law;

d.      For damages suffered by Plaintiff Player and Player Classes Members as a result of Defendants' unlawful, negligent, unfair, fraudulent, and/or deceptive practices alleged ;

e.      For restitution to Plaintiff Player and Player Classes Members of double all monies wrongfully lost on and obtained by Defendants' DFS gaming platforms as permitted under ORS 30.740;

f.      For injunctive relief requiring Defendants to cease and desist from engaging in the unlawful, negligent, unfair, fraudulent, and/or deceptive practices alleged in this operative complaint;

g.      An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

h.      For Plaintiff Player's reasonable attorneys' fees, as permitted by law;

i.      For Plaintiff Player's costs incurred;

j.      For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

k.      For such other and further relief that this Court deems just and proper

D'AMORE LAW GROUP     4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333

under equity or law, including the award of punitive damages.

DATED:  January 25, 2016.

D'AMORE LAW GROUP, P.C.

/s/ Thomas D'Amore
Thomas D'Amore, OSB No.  922735

Thomas D'Amore, OSB No.  922735
Email:  tom@damorelaw.com
Nicholas A. Kahl, OSB No. 101145
Email: nick@damorelaw.com
**D'AMORE LAW GROUP, P.C.**
4230 Galewood Street, Suite 200
Lake Oswego, OR  97035
Telephone:  (503) 222-6333
Facsimile:   (503) 224-1895

James F. McDonough, III, *pro hac vice forthcoming*,
Email: jmcdonough@hgdlawfirm.com
**HENINGER GARRISON DAVIS, LLC**
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Telephone: 404-996-0869
Facsimile: 205-326-3332

W. Lewis Garrison, Jr., *pro hac vice forthcoming*,
Email: lewis@hgdlawfirm.com
Christopher Hood, *pro hac vice forthcoming*,
Email: chood@hgdlawfirm.com
Taylor C. Bartlett, *pro hac vice forthcoming*,
Email: taylor@hgdlawfirm.com
**HENINGER GARRISON DAVIS, LLC**
2224 First Avenue North
Birmingham, AL 35203
Tel: 205-326-3336
Fax: 205-326-3332

*Attorneys for Plaintiffs and putative Class Members*

D'AMORE
LAW GROUP
4230 Galewood St., Ste. 200
Lake Oswego, OR 97035
(503) 222-6333